# CV-09 1061

Lloyd M. Eisenberg (LE-5376)
Ruya Carton (RC-6243)
**EISENBERG & CARTON**
2631 Merrick Road, Suite 201
Bellmore, New York 11710
(516) 221-3700

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

**OMEGA DIAGNOSTIC IMAGING, P.C.,**

**Plaintiff,**

-against-

**CARECORE NATIONAL, LLC,**
**CARECORE MANAGEMENT SERVICES**
**INC., NEW YORK MEDICAL IMAGING IPA,**
**INC., NYMI IPA-O, LLC, NYMI IPA-M, LLC,**
**CCN-HI IPA, LLC, CCN IPA, INC., and CCN WNY**
**IPA, INC.,**

**Defendants.**
----------------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 13 2009 ★

LONG ISLAND OFFICE

**COMPLAINT** WEXLER, J.

09-cv-

BOYLE, M.

Plaintiffs by their undersigned attorneys, Eisenberg & Carton, bring this civil action against the defendants named herein and allege as follows:

## SUMMARY OF CLAIMS

1.      This case concerns an illegal horizontal conspiracy and other improper conduct among a group of competing radiologists to preclude their competitors, including plaintiff Omega Diagnostic Imaging, P.C. ("Omega"), from providing outpatient medical diagnostic imaging (or "radiology") services to patients residing in Kings, Queens, New York, Richmond, Bronx, Nassau and Suffolk Counties. This conspiracy has distorted the competitive landscape for the provision of these services and has harmed and will continue to harm not only the diagnostic imaging practices that it targets, but also the patients in need of such services.

2.      In particular, this case concerns the actions of CareCore National, LLC ("CCN") and its principals.

3.      CCN is owned and controlled by a group of competing diagnostic imaging practices located throughout the state.

4.      CCN has entered into exclusive agreements with most of the large health care insurance plans in Kings, Queens, New York, Richmond, Bronx, Nassau and Suffolk Counties (hereinafter collectively referred to at times as "New York City/Long Island") -- including Oxford Healthcare, Aetna/U.S. Healthcare, GHI, Healthfirst, Healthnet and HIP -- to administer insurance reimbursement to their beneficiaries (patients).

5.      Upon information and belief, the total number of beneficiaries covered by the plans with which CCN contracts amounts to at least half of the lives covered by commercial insurance in Kings County and New York City/Long Island as a whole.

6.      Pursuant to its exclusive contracts with payers, CCN "certifies" diagnostic imaging practices for admission into CCN's network and, in turn, acceptance of health insurance reimbursement from the contracted health plans.

7.      Diagnostic imaging practices in Kings County and New York City/Long Island as a whole not receiving CCN certification are thus effectively precluded from servicing at least half of patients who have their diagnostic imaging services reimbursed by commercial health insurance plans.  Accordingly, these patients are precluded from receiving treatment from such diagnostic imaging practices, notwithstanding that these practices may offer them superior, personalize and innovative diagnostic imaging services.

8.      CCN and its owner-practices have allocated the market for diagnostic imaging services in Kings County and New York City/Long Island as a whole among themselves by boycotting competing diagnostic imaging practices' access to CCN's network.

9.      CCN has further allocated the market for such services by "steering" patient referrals towards its owner-practices and away from non-CCN owner-practices in its network.

10.      In light of its substantial market power, CCN's illegal conduct has yielded anticompetitive effects in the market for diagnostic imaging services; notably by reducing the output and quality of such services and by hampering innovation by diagnostic imaging practices.

11.      Moreover, CCN's boycott of competing diagnostic imaging practices, including Omega, is not driven by any legitimate business or medically-valid purpose.  Indeed, numerous

2

practices denied certification in CCN's network offer the highest-quality, state-of-the-art diagnostic imaging services.

12.     The request for damages and injunctive relief in this case stems from CCN's refusal to admit Omega into its provider network on the ground that there is no purported geographic need for Omega's services. This, despite that Omega is staffed by radiologists with stellar educational and professional credentials, and that Omega provides state of the art services.

13.     If Omega is not permitted to obtain reimbursement for treating patients in CCN's network, and CCN is not precluded from "steering" patients away from Omega, physicians will stop referring any of their patients to Omega, whether or not those patients are covered by CCN's network. That is because referring physicians are not going to take the time to figure out which patients are in CCN's network and which patients are not.

14.     This anticompetitive conduct therefore irreparably threatens the goodwill that Omega's principal, Harold Parnes, M.D., has built with referring physicians over his many years of practice and, more particularly, the goodwill that Omega has garnered since its establishment more than 12 years ago.

15.     Moreover, because of the large costs associated with its operation -- including the costs of purchasing radiology and other equipment -- Omega will likely be unable to survive without having the CCN sponsored boycott enjoined. Indeed, because of the CCN sponsored boycott, Omega is losing money every month.

16.     The amount of money that Omega is losing due to the CCN sponsored boycott can be easily measured at its minimum, but beyond that minimum cannot be measured with specificity.

17.     Accordingly, Omega is currently incurring immediate and irreparable harm from CCN's anticompetitive conduct.

18.     In addition, Omega's former second office was forced closed because it could not participate in the CCN managed plans, resulting in a loss to Omega of at least $250,000.

19.     CCN's actions amount to a group boycott and market allocation under Section 1 of the Sherman Act, whether analyzed under antitrust *per se* rule or Rule of Reason.

20.     Omega seeks injunctive relief to remedy the ongoing harm it is suffering.

21.     Omega also seeks treble damages to compensate it for its losses.

3

## JURISDICTION AND VENUE

22.     This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26 to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the federal antitrust law claims alleged herein under 15 U.S.C. § 15, and 28 U.S.C. §§ 1331, 1337.

23.     In addition, defendant CCN's headquarters are located in this state.

24.     The acts complained of herein have had, and will continue to have, substantial anticompetitive effects in this district.

25.     A substantial amount of interstate trade and commerce involved in this case and affected by the alleged violations of antitrust law occurs within this district.

26.     Accordingly, venue is proper in this district under 28 U.S.C. § 1392(a) and (b).

## THE PARTIES

### A.     Plaintiff

27.     Omega is a professional medical corporation duly organized under the laws of the State of New York on August 12, 1996.

28.     Omega is located at 1525 Voorhies Avenue, Brooklyn, New York, and previously had a second office at 81 Willoughby Street, Brooklyn, New York.

### B.     Defendants

29.     CareCore National, LLC is a New York limited liability company with its principal place of business at 169 Myers Corners Road, Wappingers Falls, New York. Its ostensible purpose is to contract with physicians and third party payers to administer insurance reimbursement to qualified diagnostic imaging practices that serve insurers' beneficiaries (patients). CCN has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

30.     CCN's corporate evolution began in 1995 with the formation of New York Medical Imaging, PLLC ("NYMI"). NYMI was formed for the purpose of contracting with health insurance companies to administer reimbursement for outpatient diagnostic imaging services.

31.     In its initial stages, NYMI approached a small group of high-profile, geographically selected radiologist practices to invest money and become members (*i.e.*, owners).

32.     In its solicitations of these practices, NYMI represented that its ultimate goal was to consolidate and control commercial payer reimbursement of diagnostic imaging services in New York.

33.     After successfully recruiting numerous practices, NYMI formed a series of independent practice associations ("IPAs") to contract with various commercial health insurers.

34.     NYMI was thereby founded, and continues to be controlled by, a small, handpicked group of practicing radiologists who own and operate their own independent diagnostic imaging practices ("owner-practices").

35.     Radiologists that own these owner-practices sit on NYMI (now CCN) boards and approve themselves as for-profit practices in NYMI's (now CCN's) network.

36.     In 2001, NYMI Management Services, LLC, was formed, and most of the IPAs were dissolved.

37.     In May 2002, NYMI Management Services, LLC, changed its name to CareCore National, LLC.

38.     Defendant CareCore Management Services Inc. ("CMS") is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.

39.     Upon information and belief, CMS has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

40.     Defendant New York Medical Imaging IPA, Inc. is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.  Upon information and belief, New York Medical Imaging IPA, Inc. has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

41.     Defendant NYMI IPA-O, LLC is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.  Upon information and belief, NYMI IPA-O, LLC has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

5

42.    Defendant NYMI IPA-M, LLC is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.  Upon information and belief, NYMI IPA-M, LLC has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

43.    Defendant CCN-HI IPA, LLC is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.  Upon information and belief, CCN-HI IPA, LLC has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

44.    Defendant CCN-IPA, Inc. is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.  Upon information and belief, CCN-IPA, Inc. has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

45.    Defendant CCN WNY IPA, Inc. is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.  Upon information and belief, CCN WYN IPA, Inc. has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

46.    CareCore National, LLC, CMS, New York Medical Imaging IPA, NYMI IPA-O, LLC and NYMI IPA-M, LLC will hereinafter be referred to collectively as CCN.

**C.    Co-Conspirators**

47.    Upon information and belief, various persons, firms, corporations, organizations and other business entities have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies.  Some of these persons, firms, corporations, organizations and business entities are known and some are unknown.  Those that are known include Nassau Radiologic Group, P.C. and Zwanger Pesiri Radiology, each of which have numerous offices in the relevant geographic market.

48.    The aforementioned unnamed individuals and business entities include, without limitation, certain of CCN's executives, board members, owner-practices and employees, as well as other competing diagnostic imaging practices throughout New York City/Long Island.

## FACTUAL BACKGROUND

### A.    Diagnostic Imaging Services

49.    Diagnostic imaging services include a variety of specialized diagnostic imaging procedures, including but not limited to Magnetic Resonance Imaging ("MRI") scans, used in the detection, diagnosis and treatment of diseases such as cancer, muscle-trauma, stroke and neurological disorders.

50.    MRI scans generate images through the combination of a strong magnetic field, radio waves and a computer to produce images of body structures.

51.    An MRI scan can be used as an accurate method of detecting head trauma, brain aneurysms, stroke, tumors and other abnormalities of the brain, including abnormalities that may produce childhood seizures and behavioral disorders, tumors or inflammation of the spine, and abnormalities of the joints and extremities.

52.    Radiologists review and interpret radiographic images for referring physicians to assist in the detection and diagnosis of diseases in patients.

53.    Practicing radiologists are often specialized in the detection and diagnosis of diseases for which they provide radiology services.

54.    As specialty care providers, radiologists receive their overwhelming majority of patients (and thus income) through physician referrals.

55.    Physician referrals are obtained by cultivating good-will in the medical community through achieving a reputation for quality in the treatment of patients.

56.    For radiologists, the capital outlay for radiographic equipment, including MRI equipment, is very high.

57.    In addition, margins for radiology practices are very low.

58.    As such, a practice's ability to finance the cost of such equipment is dependent on treating a steady flow of patients.

59.    Referrals are therefore essential to a practice's economic survival.

60.    Radiology practices compete with one another to attract the greatest possible number of referrals from physicians.

7

61.     Referring physicians select a radiology practice first and foremost on the basis of the nature and quality of the practice's radiologists and equipment.

62.     Physicians refer patients to radiology practices and subsequently rely on the specialized radiologists at that practice to assist them in diagnosing their patients' condition

63.     Under such circumstances, it is essential to the referring physician that the radiologist be of the best quality and that their equipment be state-of-the-art.

64.     The quality of the radiologist and their equipment will directly impact referring physicians' ability to treat their patients.

65.     Not all radiology practices provide the same highly trained and specialized radiologists or the same innovative equipment.

66.     Radiologists spend years specializing in particular fields of medicine in order to provide the most accurate possible reading of studies to specialized referring physicians. In order to better serve physicians, radiology practices compete fiercely to attract the best educated and trained practitioners and invest large sums in ensuring that they have access to the most innovative equipment possible.

67.     Referring physicians also choose practices on the basis of the wait time that is required of their patient by the practice. Some practices offer significantly more efficient scheduling procedures than others. Omega, through Dr. Parnes personally, offers its services at any time of day, on as many days of the week as necessary (including weekends and holidays), with virtually no delay in scheduling. The delay in getting access to a practice may be particularly important in instances where the radiology services are required to immediately diagnose or treat the patient -- such as, for example, where the referring physician needs to diagnose whether the patient requires urgent surgery. Such differences can strongly influence a physician's decision on which practice to use.

68.     Referring physicians may also choose a practice on the basis of whether the patient is a repeat-study, *i.e.* one that has come to the referring physician from another physician in which a radiological scan had already been performed. In such cases, the physician will refer the patient to the same radiology practice the patient previously used in order to assure continuity of medical treatment.   This is important for continuity of care, and for purposes of insuring that the radiologist as a complete understanding of the patient's unique health issues.

8

69.     As a matter of business and professional practice, once referring physicians have selected a radiology practice that meets the above concerns and considerations, they make sure that such a practice is able to see the vast majority, if not the totality, of their patients.

70.     In addition to wanting to ensure that all their patients are treated by highly qualified radiologists using state-of-the-art equipment, it is not administratively or economically feasible for physicians to determine whether a given radiology practice is certified to see only a portion of its patients -- due, for instance, to limitations on the insurance plans the practice can accept.

71.     As such, if for instance, CCN excludes a practice from treating patients insured by several large health plans, referring physicians will not develop a new referral relationship, or even wish to continue an existing referral relationship, with such a practice.

72.     Because of the high volume, low margin nature of radiology practices, the loss of such a relationship can quickly spell economic ruin.

73.     In addition, physicians tend not to refer patients to practices not approved to treat patients from established health care plans -- such as those in CCN's network -- as they fear that the practices' lack of approval reflects a failure by those practices to meet high standards of care.

**B.     CCN's Contracts With Commercial Insurers and Practices**

74.     CCN contracts with commercial insurance payers to administer insurance reimbursement to radiology practices that serve their beneficiaries.

75.     The contracts entered into between CCN and the health care payers it services -- known as Health Services Agreements ("HSAs") -- grant CCN broad authority to manage the health plans' network of radiology practices.

76.     Specifically, CCN is granted the authority to: (1) review and pre-authorize procedures requested by referring physicians; (2) determine whether a particular practice will be "certified" as part of CCN's network -- and thus be permitted to serve payers' beneficiaries; and (3) determine which of its certified practices will be assigned or "steered" a given referral.

77.     Through this broad grant of authority, CCN possesses outright control over practices' access to at least one half of the commercially-insured lives in New York City/Long Island (and the income to be derived from that access). According to CCN's web site, CCN has

9

implemented management contracts with Aetna, Oxford Healthcare, GHI-HMO, GHI-PPO, Healthfirst, Healthnet, Healthplus, HIP, Horizon, MDNY, and United-NJ, among others.

78.     CCN exercises its authority to review and pre-authorize treatment by requiring referring physicians to submit requests for approval for more costly radiology services, such as MRI.

79.     Until such approval is obtained, reimbursement for the radiology services performed is not granted.

80.     CCN exercises its certification authority -- choosing which practices it will accept as part of its network -- by having practices sign a Health Care Provider Network Participation Agreement ("Provider Agreement").

81.     CCN only enters into Provider Agreements with professional medical practices, not the individual radiologists who may own or provide services on behalf of these entities -- even though a professional corporation may include several such radiologists.

82.     Upon information and belief, CCN owner-practices receive a higher reimbursement rate per procedure than do non-CCN owner-practices that are approved in CCN's network.

83.     According to at least one of the Provider Manuals governing the relationship between CCN and the payers with which it contracts, when determining whether to certify a particular practice for its network, CCN is required to consider, among other things, the quality and quantity of a practice's medical staff, administrative apparatus, medical and financial records, physical plant, and medical equipment.

### C.     Omega

####     1.   Description of Facility and Practice

84.     Omega is a long-established office-based radiology and diagnostic practice providing state-of-the-art diagnostic imaging services, including magnetic resonance imaging ("MRI"), CT Scanning, Ultrasound, x-ray, bone density and Mammography services. (Omega's exclusion from the CCN managed networks  has precluded it from adding additional modalities such as PET Scanning and Nuclear Medicine.)

85.     Omega draws its patients from every borough of New York City, and also from Long Island.

86. Omega is operated by Harold Parnes, M.D., a physician licensed in New York State who is a highly trained radiologist certified though the American Board of Radiology and who has added qualifications in Neuroradiology. Dr. Parnes is a senior member of the American Society of Neuroradiology, and is a member of many other national professional societies. Dr. Parnes was also the director of neuroradiolgy at Queens General Hospital for four years and, in that capacity, trained radiology residents from Long Island Jewish Medical Center and Mount Sinai Medical Center.

87. Almost all of Omega's patients are referred to Omega by treating physicians. Those referrals are based upon Omega's name and reputation, which in turn is based upon the reputation that Dr. Parnes has built over the years as a highly skilled radiologist and neuroradiologist dedicated to the needs of patients and referring physicians..

2. CCN's Exclusion of Omega

88. Omega has been in business since 1996.

89. From virtually its inception, Omega was a participating provider for virtually every medical insurer providing coverage to patents in New York/Long Island, including Oxford, Aetna, HIP and Heath Net.

90. However, Omega's contracts were terminated (or were not renewed) with respect to each medical insurer controlled by CCN (at least with respect to network participation) as CCN gained such control.

91. Omega has repeatedly applied and appealed to CCN for inclusion in the Oxford, Aetna, HIP and Health Net physician networks.

92. Each time, CCN denied Omega, claiming a lack of "geographic need" for its services.

93. CCN's exclusion of Omega from its network denies innovative, quality service to subscribers of health plans who are in the CCN network.

3. Impact of CCN's Exclusionary Conduct

94. Referring physicians prefer to send all of their patients to a single practice that can accommodate all of their patients' radiology care.

95. An important factor in being selected as the practice of choice for a referring physician is whether or not the practice is approved to treat the vast majority, if not the totality,

11

of patients covered by the large commercial insurance payers in New York.

96.    Because referring physicians typically send all of their patients to one practice regardless of whether patients are covered by public or commercial insurance plans, a radiology practice must be able to treat patients under all insurance plans to be considered by referring physicians as an acceptable choice for radiology care.

97.    Although Omega receives physician referrals based on word-of-mouth for its high quality of care, upon information and belief, many other referring physicians are discouraged from sending patients to Omega because of its non-participation in CCN's network.

98.    Because it has been denied admission to CCN's network by the defendants, Omega has lost the opportunity to treat patients who have Oxford, Aetna, HIP, and Health Net insurance.

99.    The patients in those plans previously constituted a high percentage of Omega's total patients.

100.    Through February 28, 2009, Omega has lost at least $1,000,000.00 because it has been unable to treat and receive reimbursement for patients covered under the CCN plans.

101.    That is Omega's MINIMUM loss caused by defendants' exclusion of Omega from the CCN network.

102.    However, Omega currently has no way of determining the loss of business and revenue that it has suffered by reason of its having been not listed as a provider in CCN's network, which would have permitted physicians and patients unfamiliar with Omega's services of Omega's existence and services.

103.    Moreover, upon information and belief, patients insured under plans which permit them to seek treatment "out of network," but who still must call CCN for prior approval of radiologic services, are steered to CCN owner-members even when they ask for approval for services to be rendered at Omega.

104.    If Omega is not allowed to accept insurance reimbursement from the health plans that contract with CCN's program, it stands to lose at least $500,000.00 per year as a result of having to provide services at no charge in order to maintain its base of referring physicians.

105.    Furthermore, Omega, upon information belief, expects that CCN will continue to steer from Omega to CCN owner-practices patients insured under plans which permit them to

seek treatment "out of network," but who still must call CCN for prior approval of radiologic services.

106.    Moreover, as referring physicians have made clear, if Omega cannot accept patients from CCN payers, they will stop referring *any* of their patients to Omega -- notwithstanding the type of insurance that they have.

107.    As described below, referring physicians have also made clear that it will be difficult for them to send patients to Omega since CCN has been "steering" patients to its owner-practices.

108.    Accordingly, even if CCN is enjoined from refusing Omega admission to its network, CCN will continue steering patients away from the practice and towards its owner-practices.

109.    Unless CCN is also enjoined from engaging in such steering practices, Omega's economic survival will be jeopardized.

110.    Without the requested injunction, Omega projects that it will not be able to survive.

111.    Patients -- both from Omega and other referral sources -- will lose the benefit of competition in the radiology services market.

112.    They will be unable to benefit from Omega's investment in new state-of-the-art technologies and from Omega's superior quality care as highly specialized radiologists.

**D.    Anticompetitive Conduct**

113.    CCN is granted broad power by healthcare payers to manage the reimbursement of radiology services to their beneficiaries.

114.    Rather than manage a network of qualified, quality practices for payers, CCN and its owner-practices have used their power to create their own exclusive network to reduce competition in the market for radiology services in New York City/Long Island.

115.    Specifically, CCN and its owner-practices have: (1) conspired to boycott Omega and other competing practices by denying them access to CCN's network; and (2) conspired to allocate the market for radiology services by steering patients away from competing practices and towards CCN owner-practices.

1.   <u>CCN and its Owner-Practices Conspired to Boycott Omega and
Competing Radiology Practices</u>

116.   As the manager of its health plan clients' network of radiology practices, CCN has
the authority to determine whether a particular practice will be "certified" and thus permitted to
serve a health plan's beneficiaries.

117.   Through this broad grant of authority, CCN possesses outright control over
practices' access to almost at least half of the commercially covered lives in Kings County and
New York City/Long Island as a whole -- and the income to be derived from that access.

118.   Defendants CCN and its owner-practices have colluded to use their certification
authority to illegally exclude competing practices such as Omega from access to reimbursement
from commercial insurers.

119.   Rather than face competition from practices offering innovative treatment and
superior services, CCN's owner-practices have used CCN as a means through which to boycott
competitors, thus significantly reducing competition in the market for radiology services.

120.   Instead of determining whether to allow a practice into its network by considering
objective criteria such as the quality and quantity of a practice's medical staff, administrative
apparatus, medical and financial records, physical plant, medical equipment or, even whether
there is truly a need within a geographical area for the services -- as required by at least one of its
agreements with healthcare payers -- defendants have adopted a fictitious and arbitrary
"geographical necessity" test designed to protect owner-practices from competitors by excluding
non-CCN owner-practices from its network when useful to do so.

121.   CCN uses "geographical necessity" as a pretext for denying approval to, and
removing non-CCN owner-practices from, its network, while at other times ignoring the standard
to avoid obstructing the business interests of its owner-practices -- such as by letting them open
several new practices in a geographic area after denying other requests within the same area.

122.   At no time has CCN developed any objective criteria to implement its
"geographic necessity" test.

123.   Alternatively, to the extent that CCN has developed any objective criteria to
implement its "geographic necessity" test, that test is not applied equally to its owner-practices.

14

124.   Defendants used the fictitious "geographic necessity" test as a pretext to repeatedly deny Omega from participating in CCN's network.  The real reason for that denial is that Omega is a direct competitor to CCN owner-practices.

125.   CCN together with its owner-practices conspired to boycott Omega's approval into CCN's network in order to limit competition and allocate the market for radiology services in Kings County and New York City/Long Island as a whole.

126.   CCN has no legitimate reason for denying approval to Omega, particularly in light of the fact that Omega offers the specialized services described above.

127.   Nor do defendants have any legitimate business or medical purpose for their anticompetitive conduct.

128.   In fact, many of the practices boycotted from CCN's network, including Omega, offer state-of-the-art services not available in the alleged "geographical area," as well as more efficient scheduling procedures, shorter waiting times, and superior administrative services to patients and referring physicians.

129.   CCN's anticompetitive boycott of Omega and other radiology practices is having the effect of depriving continuity of care to patients, as well as reducing output of superior and state-of-the-art and timely radiology services to both patients and referring physicians who treat those patients.

130.   Indeed, radiology practices that have been boycotted from CCN's network have found themselves in a very precarious financial situation.

2.   CCN and its Owner-Practices Conspired to Allocate the Market for
Radiology Services by Steering Patients to CCN Owner-Practices

131.   CCN does not deny that it steers patients to radiology practices.

132.   In letters sent to referring physicians and on its web site, it has explained its use of mandatory scheduling procedures whereby referring physicians are not entitled to decide which radiology practice to use based upon who they believe to be the best and most trustworthy radiology provider, and pursuant to which CCN elects where patients will be treated.

133.   Nor does CCN deny that it steers patients to its owner-practices.

134.   On its web site, CCN states that: "Owner members of CareCore may be listed before other members of the network."

135.    Defendants continue steering patients to their owner-practices despite having previously been advised by the office of the Attorney General that such a practice is impermissible and ought to be stopped.

136.    Defendants use their control over the referral process to steer patient referrals for highly reimbursed procedures to CCN owner-practices and away from non-owner-practices.

137.    In this way, CCN owners, themselves competing practices, have colluded to allocate the market for radiology services to the detriment of their competitors.

138.    By overriding the referring physician's prerogative to refer a patient to a high quality convenient office, CCN has effectively controlled competition in the market for radiology services.

139.    By using the control of the referral process to benefit practices that are CCN owner-practices, defendants have allocated the market for radiology services between a limited group of radiology practices.

140.    CCN's illegal allocation of radiology services is eliminating competitors and reducing output in the market for such services.

141.    The illegal conduct is also reducing innovation in state-of-the-art imaging technology and superior services to the detriment of patients and physicians who treat them.

142.    CCN has in fact created a network within a network under which CCN owners benefit, other radiology practices are effectively boycotted, and patients in most cases receive less than optimal care.

143.    In addition, such an illegal allocation of the market for radiology services has interfered with referring physicians' exercise of their professional judgment in selecting a facility for their patients, thus jeopardizing their patients' health.

144.    The New York Medical Society of the State of New York has passed a resolution requesting that the state Department of Health investigate CCN's practice of steering patients away from practices chosen by referring physicians.

145.    Referring physicians have complained that CCN allocates the market for radiology services by steering referrals away from non-CCN owner-practices in three ways.

16

146.    First, by delaying the authorization of requested treatment referred to a non-owner-practice for an unreasonable period of time without any valid justification -- while conversely providing a prompt and difficulty-free authorization to CCN owner-practices.

147.    Second, by falsely informing referring physicians that a non-owner-practice is not part of a given plan's network and that the patient must be referred to another, CCN owner-practice.

148.    Third, by creating automated referral procedures in which physicians are denied the ability to select non-CCN owner-practices and/or forced to select a limited number of preferred practices.

149.    CCN has no legitimate business or medical justification for its anticompetitive conduct.

150.    Steering does not reduce the cost of services rendered since both the CCN owner-practices and the non-CCN owner-practices receive the same payment rate.

151.    Moreover, upon information and belief, CCN's claim that its steering is aimed at increasing patients' choice in selecting a radiology practice is false.

152.    Upon information and belief, at least one patient has received a letter indicating (falsely) that he has no choice but to receive treatment at a specific CCN designated practice (a CCN owner).

153.    Upon information and belief, the letter states that "failure to obtain the procedure listed above at the approved location will result in you being held financially responsible for any payment of service."

154.    Similarly, upon information and belief, CCN's alleged claim that steering serves the needs of patients by finding them a practice next to their home has been shown to be false by CCN's own statements and actions.

## RELEVANT MARKETS

155.    There are two relevant product markets in this case.  The market for outpatient medical diagnostic imaging services, and the market for commercially-insured outpatient medical diagnostic imaging services.

17

156.    For both relevant product markets, the relevant geographic market is Kings County and is in no case larger than New York City/Long Island.

157.    Moreover, the relevant geographic area for purposes of the analysis and consideration of Omega's claims is arguably as narrow as whatever geographic area CCN applied when it determined to exclude Omega from its network in the purported ground of no "geographic need."

158.    The market for outpatient medical diagnostic imaging services is a relevant product market since few, if any, feasible alternatives exist to purchasers of such services -- in this case insurers in Kings County and New York City/Long Island as a whole who purchase the services as agent for their beneficiaries (the ultimate consumer).

159.    Such purchasers do not, for example, view cardiology or obstetric services as acceptable substitutes for diagnostic imaging services.

160.    In addition, inpatient diagnostic imaging services obtained in a hospital setting are not generally good substitutes for outpatient diagnostic imaging services provided at free-standing practices in the eyes of such purchasers.

161.    Inpatient diagnostic imaging services are typically used in emergency medical situations where immediate care is needed, and are accordingly priced at significantly higher price points than the same services provided in an outpatient setting.

162.    The market for commercially-insured outpatient medical diagnostic imaging services is also a relevant product market since a substantial number of consumers obtaining health care services through a commercial insurer would not be able to alternatively obtain publicly-provided insurance coverage (*i.e.*, Medicare or Medicaid) if faced with a price increase or a reduction in quality of services.

163.    For example, employers, who contract with health insurers on behalf of their employees, typically do not have the option of switching employees from a commercial insurance plan to the publicly-sponsored Medicaid or Medicare program since only individuals meeting specific eligibility criteria (e.g., income or age restrictions) may enroll.

164.    Due to the general non-substitutability between private and public forms of insurance, outpatient diagnostic imaging services provided to commercially-insured individuals is a separate relevant product market in this matter.

18

165.    The relevant geographic market in this matter is Kings County and is in no case larger than New York City/Long Island.

166.    Very few individuals needing outpatient diagnostic imaging services in Kings County would leave Kings County or its physically adjacent counties in order to obtain such services, even if faced with a price increase or a reduction in quality of such services in the county.

167.    Even fewer individuals, if any, would leave New York City/Long Island to obtain such services if faced with a price increase or reduction in quality -- demonstrating that the geographic dimensions of the relevant market is no larger than those four counties.

168.    In addition, when purchasing diagnostic imaging services, commercial health insurers seek to contract with radiologists and practices that are in close proximity to where their enrollees live or work.

169.    If an insurer is unable to build a local network of healthcare practices that offers sufficient access to its enrollees, it will not be successful in selling its products in that geographic market.

170.    It follows that purchasers, such as health insurance companies that market health benefit plans to employers located in Kings County, typically would not find diagnostic imaging practices located outside Kings County or its physically adjacent counties to be acceptable substitutes for diagnostic imaging practices located in Kings County.

171.    Even if such purchasers were able to market health benefit plans to employers located in Kings County by offering radiology services located in other areas, in no case would they be successful in marketing such plans to employers by offering services outside of New York City/Long Island (*e.g.*, in Boston). For these reasons, the relevant geographical market is Kings County, is in no case larger than New York City/Long Island as a whole, and may be as narrow as whatever geographic area is considered by CCN in excluding Omega from its network on the purported ground of no "geographic need."

## MARKET POWER

172.    Upon information and belief, CCN contracts with insurers to cover at least one half of the commercially-insured lives in Kings County and New York City/Long Island as a whole.

19

173.     CCN's shares within these defined geographic areas are substantial and imply that CCN commands market power over such areas.

174.     CCN and its owner-practices manage reimbursement for commercial payers and have the authority to decide which diagnostic imaging practices will be permitted to see patients covered by such payers.

175.     As such, CCN is the *de facto* if not *de jure* exclusive provider of diagnostic imaging services to such payers.

176.     Diagnostic imaging practices in Kings County and New York City/Long Island as a whole that are not members of CCN's provider network are thus effectively foreclosed from competing for at least one half of commercially-insured lives in Kings County and New York City/Long Island as a whole.

177.     Such practices that are not members of CCN's provider network cannot effectively compete against CCN owner-practices without having access to such a large share of the commercially-insured outpatient medical diagnostic imaging services market.

## HARM TO COMPETITION

178.     Through their group boycott and market allocation, defendants have harmed competition by reducing output and hampering innovation in the relevant downstream markets.

179.     Defendants' anticompetitive conduct has resulted in the exclusion of competition from superior, state-of-the-art practices not currently part of CCN's network.

180.     It has also resulted in the exclusion of competition from superior, state-of-the-art practices within CCN's network but not from owners of CCN.

181.     Defendants' illegal conduct prevents patients from obtaining the full panoply of care available from participating practices of their choice, and inhibits or prevents physicians from delivering that care at all or with any continuity.

182.     Defendants' conduct has reduced output of diagnostic imaging services by driving practices out of business and reducing introduction of new systems at existing offices, thus visiting dual harm upon practices ousted from the market and upon the patient's interest in having a range of choices in healthcare practices.

183.   Defendants' conduct has also interfered with referring physicians' exercise of their professional judgment in selecting a facility for their patients thus jeopardizing their patients' health.

184.   In addition, defendants' conduct with respect to pre-authorization and steering has in many cases harmed patients and increased costs by having incorrect examinations approved and requiring second, correct examinations performed.

## FIRST CLAIM FOR RELIEF
### (*Per Se* or Rule of Reason Group Boycott)

185.   Plaintiff repeats and realleges each and every allegation of this complaint as if fully set forth herein.

186.   Each of the defendants, along with their co-conspirators, have entered into continuing illegal contracts, combinations, agreements or conspiracies in restraint of trade, the purpose and effect of which are to eliminate competition from non-CCN owner-practices in providing services to patients.

187.   These contracts, combinations, agreements or conspiracies are illegal both *per se* and under the Rule of Reason under Section 1 of the Sherman Act, 15 U.S.C. § 1.

188.   Each of CCN and its owners collectively possess and exercise market power in the market for healthcare network access services in Kings County and New York City/Long Island as a whole.

189.   These contracts, combinations, agreements or conspiracies have caused substantial anticompetitive effects.

190.   These contracts, combinations, agreements or conspiracies have excluded competition from non-CCN owner-practices, have restricted the variety of diagnostic imaging services available to consumers, have reduced the quality of medical care to patients, and have artificially reduced output of diagnostic imaging services in Kings County and New York City/Long Island as a whole.

191.   These contracts, combinations, agreements or conspiracies have no legitimate business purpose.

192.   These contracts, combinations, agreements or conspiracies achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

193.   As a result of these violations of Section 1 of the Sherman Act, plaintiff has been injured in his business and property in an amount not presently known, but which is, at a minimum, $1,000,000, prior to trebling.

194.   As a result of these violations of Section 1 of the Sherman Act, plaintiff also faces irreparable injury.

195.   Such violations and the effects thereof are continuing and will continue unless injunctive relief is granted.

196.   Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### (*Per Se* or Rule of Reason Market Allocation)

197.   Plaintiff repeats and realleges each and every allegation of this complaint as if fully set forth herein.

198.   Each of the defendants, along with their co-conspirators, have entered into continuing illegal contracts, combinations, agreements or conspiracies in restraint of trade, the purpose and effect of which are to steer non-CCN owner-practices and/or to provide and allocate the market for commercially-insured outpatient diagnostic imaging services in Kings County and New York City/Long Island as a whole among themselves.

199.   These contracts, combinations, agreements or conspiracies are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.

200.   These contracts, combinations, agreements or conspiracies are also illegal under the antitrust Rule of Reason standard.

201.   These contracts, combinations, agreements or conspiracies have caused substantial anticompetitive effects.

202.   These contracts, combinations, agreements or conspiracies have excluded competition from non-CCN owner-practices, have restricted the variety of diagnostic imaging services choices available to consumers, have reduced the quality of medical care to patients, and have artificially reduced output of diagnostic imaging services in Kings County and New York City/Long Island as a whole.

203.   These contracts, combinations, agreements or conspiracies have no legitimate business purpose.

204.   These contracts, combinations, agreements or conspiracies achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

205.   As a result of these violations of Section 1 of the Sherman Act, plaintiff has been injured in his business and property in an amount not presently known, but which is, at a minimum, $1,000,000, prior to trebling.

206.   As a result of these violations of Section 1 of the Sherman Act, plaintiff also faces irreparable injury.

207.   Such violations and the effects thereof are continuing and will continue unless injunctive relief is granted.

208.   Plaintiff has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
**(Tortious Interference With Business Relations)**

209.   Plaintiff repeats and realleges each and every allegation of this complaint as if fully set forth herein.

210.   By inserting themselves between the defendant healthcare plans and Omega, and by refusing Omega admission to the CCN networks, defendants are interfering (and have interfered) with Omega's business relations with the healthcare plans controlled by defendants as well as with Omega's patients.

211.   Defendants are interfering (and have interfered) with Omega's business relations through wrongful means by purporting to act as a management service for the healthcare plans covered by the CCN networks and by hiding their true purpose to eliminate competition for the defendants' owner/members.

212.   Moreover, under New York State law (specifically, Article 45 of the Public Health Law) it is illegal to "engage in for profit, any business or service which in whole or in part includes the referral or recommendation of persons to a physician" Pub. H. Law § 4501, 4502.

213.   Federal law provides similar prohibitions against physician self-referral.

214.    The defendants are for-profit organizations (and individuals) that directly and indirectly control the referral of patients to certain physicians, as detailed more specifically above.

215.    Thus, through these wrongful means, they have tortiously interfered with Omega's business relations with its patients and the health care plans covered by the CCN networks.

216.    As a result of defendants' wrongful conduct, plaintiff has been injured.

## FOURTH CLAIM FOR RELIEF
### (Common Law Unfair Competition)

217.    Plaintiff repeats and realleges each and every allegation of this complaint as if fully set forth herein.

218.    The defendants' conduct unreasonably interferes (and has unreasonably interfered) with and is damaging (and has damaged) Omega's business.

219.    Defendants gained an unfair competitive advantage for their owner/member radiologists by using their positions as the establishers, maintainers, and administrators of networks of radiologists for the healthcare plans to exclude potential competitors, including Omega.

220.    The defendants' conduct constitutes a misappropriation of a commercial advantage belonging to Omega.

221.    Defendants have acted together in bad faith to wrongfully deprive Omega the ability to be paid for providing services to patients insured by the healthcare plans covered by the CCN networks.

222.    As a result of defendants' wrongful conduct, plaintiff has been injured.

## RELIEF SOUGHT

WHEREFORE, plaintiff respectfully requests the following relief:

A.    That the Court declare, adjudge and decree that defendants have committed the violations of federal and state law alleged herein;

B.      That defendants, their directors, officers, members, employees, agents, successors, and assigns be enjoined and restrained from, in any manner, directly or indirectly, (1) precluding Omega from offering various radiological services to beneficiaries covered by commercial payers that contract with CCN; (2) "steering" patients that have been referred to Omega away from it and towards CCN owner-practices; and (3) committing any other violations of Section 1 of the Sherman Act and/or the state law alleged herein;

C.      That plaintiff be granted a judgment against the defendants, jointly and severally, with damages, in an amount to be proven at trial, to be trebled according to law, plus interest -- including prejudgment interest -- to compensate it for the damages it incurred from defendants' violations of the federal antitrust laws and/or the state law alleged herein.

D.      That the Court award plaintiff attorneys' fees and costs of suit, and such other and further relief this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

DATED:  Bellmore, New York
        March 12, 2009

EISENBERG & CARTON

By: _____
     Lloyd M. Eisenberg (LE 5376)
     Ruya Carton (RC 6243)
   2631 Merrick Road, Suite 201
   Bellmore, New York 11710
    (516) 221-3700

*Attorneys for Plaintiff*